UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIRECT STEEL, LLC D/B/A DIRECT
STEEL AND CONSTRUCTION,

        Plaintiff,

        v.

AMERICAN BUILDINGS COMPANY,

        Defendant.

No. 22 CV 226

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

The US Army Corps of Engineers hired plaintiff Direct Steel to construct pre-engineered metal buildings. Direct Steel subcontracted with defendant Nucor Building Systems Texas[1] to provide the materials. Nucor later sent Direct Steel multiple change orders increasing the contract prices. Direct Steel brought this lawsuit challenging the validity of the change orders and alleging a fraud claim. Direct Steel also brought a separate, related case alleging a False Claims Act claim. Nucor moves for judgment on the pleadings on the contract and fraud claims and moves to dismiss the False Claims Act claim. Nucor counterclaimed for breach of

---

[1] Direct Steel named American Buildings Company as the defendant and argues that it is the proper party because it signed the parties' contracts. [47] at 1 n.1. But as of October 2020, American Buildings Company merged into Nucor Corporation through Nucor Building Systems Texas. [53] at 1 n.1. Nucor admits it owns all assets and liabilities of American Buildings Company. *Id.* A merger does not affect parties' contractual obligations—the absorbing corporation simply acquires the liabilities of the absorbed corporation. *Rizvi v. Am. Express Nat'l Bank*, No. 02-19-00197-CV, 2020 WL 3969585, at *5 (Tex. App. June 18, 2020). While the original contracting party was American Buildings Company, I refer to defendant as Nucor throughout for clarity.

contract alleging Direct Steel has not paid the final contract price under the change orders. Nucor moves for summary judgment on this claim.

## I. Facts

Plaintiff Direct Steel provides general contractor and construction management services for public and private clients. [54] ¶ 1; [20] ¶ 13; 22-cv-3860, [1] ¶ 23.[2] In December 2020, the United States Army Corps of Engineers awarded Direct Steel a contract to construct several pre-engineered metal buildings. [54] ¶ 2; [20] ¶ 14; 22-cv-3860, [1] ¶ 26.

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1.

The facts are largely taken from Direct Steel's complaints, [20]; 22-cv-3860, [1]; Nucor's answer, [21]; and the parties' responses to the Local Rule 56.1 statements, [47] and [54], where both the asserted fact and the opposing party's response are set forth in one document. Other than where noted to be an allegation or evidence submitted on summary judgment, the facts are identical across the three motions at issue here. For purposes of Nucor's motion to dismiss, I only consider Direct Steel's allegations. I consider all of the parties' pleadings when addressing Nucor's motion for judgment on the pleadings.

For purposes of summary judgment, I consider the parties' admissible evidence. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Nucor claims to lack sufficient knowledge to admit or contest paragraphs 22–28 and 34 of Direct Steel's L.R. 56.1 statement. [54] ¶¶ 22–28, 34. Such responses are unacceptable at the summary judgment stage and constitute de facto admissions. *Karazanos v. Madison Two Assocs.*, 147 F.3d 624, 626 (7th Cir. 1998). I disregard all immaterial facts and legal conclusions. *See* [47] ¶¶ 11, 27, 29, 37–38, 40–41, 44; [54] ¶¶ 12, 14, 20. General objections to how facts are characterized, *see* [47] ¶¶ 14–15, 34, 42; [54] ¶¶ 13, 17–19, 21, 29–30, 35, are sustained and I omit the characterizations and rely on the underlying evidence when possible. I ignore facts included in statements or responses that are not supported by the parties' cited evidence. N.D. Ill. Local R. 56.1(d)(2), (e)(3); *see* [47] ¶ 13; [54] ¶¶ 6, 34. Direct Steel's objections to the Pikett declaration as conclusory and lacking supporting evidence are overruled. *See* [47] ¶¶ 14, 17, 24. Direct Steel does not challenge that Pikett has personal knowledge regarding his statements and can testify to the same at trial. While the lack of underlying evidence to support his statements may affect his credibility at trial, it does not affect admissibility on this motion. When the parties dispute facts and both rely on admissible evidence, I set forth both sides' facts.

In January 2021, Direct Steel and defendant Nucor Building Systems Texas entered into two contracts for materials to build a warehouse and covered storage building for $947,788. [20-2]; [20-3]. The contracts stated that the quoted prices would be honored if they were entered into by February 6, 2021. [20-2] at 25; [20-3] at 20. Direct Steel signed the contracts on January 15, 2021. *Id.* Nucor signed them on January 26, 2021. *Id.*

The contracts also included a "Must Ship By Date" of May 29, 2021. *Id.* The contracts specified:

> Any "Must Ship By Date" set forth in the Sales Documents is for purpose of price protection only. If the Products do not ship by the designated "Must Ship By Date" due to delays beyond [Nucor's] control, including without limitation, Purchaser [Direct Steel] Delays, (a) the price provided in the Sales Documents may be increased by [Nucor] for any additional costs incurred by [Nucor], with such price increases shall be implemented by Change Order . . . issued by Seller, which shall be binding on [Direct Steel], and (b) [Nucor] shall invoice [Direct Steel] for the full amount of the purchase price of such Products.

[20-2] at 22; [20-3] at 17. "Delivery schedules will be extended due to any delays in approvals, order clarification, Product or design changes, credit hold, or [Direct Steel] or end customer ('End Customer') design or fabrication holds ('Purchaser Delays')." *Id.*

The contracts also provided that:

> In the event [Direct Steel] fails to make payment to [Nucor], or any affiliate of [Nucor], of any amounts due and owing to [Nucor] or such affiliate (including any applicable surcharge or freight charge), [Nucor] shall have the right to terminate any Sales Documents or any unfulfilled portion thereof, and [Nucor] or any affiliate thereof may terminate any other agreement between [Nucor] or such affiliate and [Direct Steel].

*Id.* Nucor "may charge interest on the outstanding balance at a rate of 1.5% per month, or the highest rate allowed by law (whichever is less)." *Id.* Nucor "shall have the right to employ an attorney to collect the balance due, and [Direct Steel] agrees to pay all collection costs incurred by [Nucor], including its reasonable attorneys' fees." *Id.*

Direct Steel's vice president says that he spoke with a Nucor representative before entering the contracts. [49] ¶ 15. According to him, the parties discussed the contract terms and he was led to believe that the materials would be delivered by the "Must Ship By Date" for the stated price. *Id.* In contrast, Nucor's representative states that he made clear that the delivery week was to be determined; Nucor would not purchase materials or schedule fabrication/delivery before being fully approved to do so; and that the price was likely to increase as delivery would likely occur after the price protection date. [54-1] ¶ 5. Nucor also submits an email between the parties that stated the same. [54-1] at 6–7.

After Direct Steel signed the contracts, Nucor sent an Order Acknowledgement and Acceptance for each contract to Direct Steel. [20-2] at 3–8; [20-3] at 3–8. Direct Steel attached the acknowledgments as part of the contracts in its complaints. *See* [20] ¶ 16 (attaching [20-2] as the warehouse contract including the warehouse acknowledgment); ¶ 18 (attaching [20-3] as the covered storage contract including the storage acknowledgment); 22-cv-3860, [1] at 57–62; 106–11. In its opposition to Nucor's motion for summary judgment, Direct Steel now contends that the

4

acknowledgments are not part of the contracts because they were not part of the document Direct Steel signed. [46] at 5.

Typically, a contract does not incorporate an unsigned document unless the signed document plainly refers to the other writing. *Sierra Frac Sand, LLC v. CDE Glob. Ltd.*, 960 F.3d 200, 203 (5th Cir. 2020) (citing *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)). The contracts here do not refer to the acknowledgments and define the "entire agreement" as the "mutually executed Sales Documents . . . together with the[] terms and conditions." [20-2] at 21; [20-3] at 16. But an allegation in a complaint is a judicial admission that can be used against the plaintiff. *Moran v. Calumet City*, 54 F.4th 483, 494 (7th Cir. 2022); *see also Whitlock v. Brown*, 596 F.3d 406, 412 (7th Cir. 2010) ("A judicial admission trumps evidence."). I consider the acknowledgments as part of the contracts based on Direct Steel's admission.

In relevant part, the acknowledgments stated:

> [T]he Order price given is based on the order shipping not later than our **"Must Ship by date"** of May 29, 2021. **THE "MUST SHIP BY DATE" IS A PRICE PROTECTION DATE AND NOT A DELIVERY DATE.** [Nucor] will honor the above price as long as the delivery is made on or before the "Must Ship by Date" noted above. If this project is an approval order, EWO, put on hold, or if there are any changes made that push the deliver of this project past the "Must Ship by Date" then the price of this project could change. Currently, your project is: **Scheduled for an approval/EWO with NO delivery date scheduled.**

[20-2] at 3; [20-3] at 3 (emphasis in original). The acknowledgments also included a "Project Schedule" that set the "Final Drawings (Mail Date)," "Fabrication Process," and "Delivery Week Ending" as "To be Determined." [20-2] at 7; [20-3] at 7.

The parties dispute the cause of project delays. They agree that the project was not placed on hold. [54] ¶ 10; [20] ¶ 26; 22-cv-3860, [1] ¶ 40. Nucor presents evidence that Direct Steel made some changes to the warehouse project in January and February 2021. [54] ¶ 9. According to Direct Steel's vice president, it did not make any design changes or make any order clarifications. [49] ¶ 18. Nucor also denies causing any delays. [38-2] ¶ 22. Direct Steel's vice president says that Nucor promised to send the final drawings by March 19, 2021, but did not do so until March 25, 2021. [49] ¶¶ 20–21.

On March 4, 2021, Nucor sent Direct Steel its first change order related to the warehouse contract. [20-4] at 2. The change order increased the price by $2,135. *Id.* The order notes changes in building dimensions, updated locations due to these changes, and eave and rake extensions. *Id.* Nucor's sales manager states that the price change reflected increased costs associated with these changes. [38-2] ¶ 16. Direct Steel signed the change order on August 18, 2021. [20-4] at 2.

Nucor sent a second change order on April 22, 2021, increasing the price of the warehouse contract by $324,377. [20-4] at 7. The order does not specify why there was a cost increase. *See id.* Nucor's sales manager states that the increase covered additional incurred costs. [38-2] ¶ 19. The second change order set the warehouse project schedule, including a delivery date in October 2021. [20-4] at 7. Direct Steel signed the second change order on June 29, 2021. *Id.*

While these change orders were pending in June 2021, Nucor emailed Direct Steel stating that "[i]f Direct Steel continue[d] to be in breach of the agreement by

refusing the cost increase, [it would] leave [Nucor] with no choice but to consider exercising [its] rights related to such breach, which [could] include terminating the order entirely." [20-5] at 4. Direct Steel's vice president says that this "notice of cancellation was rescinded by [Nucor] on July 1, 2021," after Direct Steel signed the change orders. [54] ¶ 15. Nucor's sales manager says it never sent nor rescinded a formal notice of cancellation. *Id.*

In July 2021, Nucor sent Direct Steel a change order request to the covered storage contract, which Direct Steel signed the next day. [20-6] at 2. It increased the covered storage contract by $106,749. *Id.* The change order did not state what this increase covered, but Nucor's sales manager attributes it to additional incurred costs. *See id.*; [38-2] ¶ 26. The change order set the covered storage project schedule with delivery dates starting in October 2021. [20-6] at 2.

Direct Steel alleges that Nucor's demands put Direct Steel in a difficult position. [20] ¶ 47; 22-cv-3860, [1] ¶ 56. Pre-engineered metal buildings entail long lead times and any delay in delivery would have delayed the entire project. [54] ¶ 22; [20] ¶ 48; 22-cv-3860, [1] ¶ 57. Such a delay would have exposed Direct Steel to liquidated damages, extended overhead costs, and other delay-related damages. [54] ¶ 22; [20] ¶ 48; 22-cv-3860, [1] ¶ 58. It would have also damaged Direct Steel's relationship with the Army Corps and risked disqualifying Direct Steel from future federal contracts due to a poor Contractor Performance Assessment. [54] ¶ 23; [20] ¶ 49; 22-cv-3860, [1] ¶ 59.

7

Along with signing the change orders, Direct Steel sent two emails stating that it "expressly reserve[d] all rights to later pursue a claim against [Nucor]. But, for now, [it would] acquiesce to signing the unilaterally imposed Change Order form[s]." [20-5] at 2; [20-7] at 2–3. Direct Steel stated that it "explored the possibility of contracting with other manufacturers, but, among other things, current lead times [we]re running approximately +30 weeks." [20-5] at 2; [20-7] at 2. Direct Steel asserted that it was signing the change orders under economic duress and "as a business necessity." *Id.* In response, Nucor asked whether "Direct Steel [would] attempt to withhold full payment of the entire purchase price as adjusted by the Change Order." [38-2] at 11. Direct Steel replied that it would "comply with its contractual obligations. [Its] reservation of rights [wa]s not a declaration that [it] intend[ed] to breach the contract, nor [wa]s it grounds for [Nucor] to withhold performance." *Id.*

Nucor sent a third change order to the warehouse contract to credit Direct Steel $26,402 in August 2021, which Direct Steel immediately signed. [20-4] at 8.

At the time it sent the change orders increasing costs, Nucor had not yet started fabrication of the required materials. [54] ¶ 11; [20] ¶ 109; 22-cv-3860, [1] ¶ 52. Nucor began delivering materials in October 2021 and completed by January 2022. [47] ¶ 46; [54] ¶ 32.

After the change orders, the full contract price was $1,354,647. *See* [20-4] at 8 ("Total revised [warehouse] contract price: $1,038,079"); [20-6] at 2 ("Total revised [covered storage] contract price: $316,568"). Direct Steel has paid Nucor $1,098,312.

[20] ¶ 121; [47] ¶ 39. Direct Steel has refused to pay Nucor the additional $256,334.90. [47] ¶ 42.

Direct Steel alleges that Nucor set up the contracts intending to extort the additional money from Direct Steel from the start. Direct Steel alleges that it entered the contracts on the understanding Nucor would deliver the materials by the price-protection date at the prices quoted. [20] ¶ 28; 22-cv-3860, [1] ¶ 42. But Nucor allegedly provided falsely low quotes to obtain the contracts, entered the contracts knowing that it would not honor the quoted prices, and then later substantially increased the prices after it was too late for Direct Steel to find another supplier. [20] ¶¶ 29–30; 22-cv-3860, [1] ¶¶ 43–44. Allegedly, Nucor intentionally and purposefully failed to deliver the materials by the "Must Ship By Date" to charge Direct Steel more than the contracted amounts. [20] ¶ 23; 22-cv-3860, [1] ¶ 37. Nucor allegedly knew that this delay would put Direct Steel in a difficult position and that no other suppliers could provide the materials within Direct Steel's timeline. [20] ¶¶ 56–58; 22-cv-3860, [1] ¶¶ 60–62.

Nucor denies all of Direct Steel's allegations regarding the low contract prices, Nucor's intent upon entering the contracts, the contracts' delivery dates, delays in the project, and Nucor's knowledge of the pressures on Direct Steel. [21] ¶¶ 7–9, 23–26, 28–30, 37–38, 56–59, 99–108, 112–13, 117–20.

## II.  Summary Judgment

Summary judgment is warranted if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'Material facts' are facts that 'might affect the outcome of the suit,' and a dispute as

9

to those facts is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The non-moving party is given "the benefit of conflicting evidence and any favorable inferences that might be reasonably drawn from the evidence." *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022).

## A.    Breach of Contract

To succeed on its breach of contract claim, Nucor must establish the existence of a valid contract, its performance, Direct Steel's breach of the contract, and damages sustained because of the breach. *See Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 468 S.W.3d 557, 573 (Tex. App. 2014).[3]

A valid contract requires proof that "(1) an offer was made; (2) the other party accepted in strict compliance with the offer's terms; (3) the parties had a meeting of the minds on the contract's essential terms; (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

---

[3] This court has jurisdiction because Direct Steel's sole member is a citizen of Illinois, American Buildings Company is a citizen of Delaware and Alabama, Nucor is a citizen of Delaware and North Carolina, and the amount in controversy is more than $75,000. [20] ¶¶ 10–12; [19] at 1 n.1; 28 U.S.C. § 1332(a)(1). The parties agree that Texas law applies to their contract claims. [37] at 9 n.3; [46] at 5.

Nucor has presented evidence that it offered, and Direct Steel accepted, the terms of the original contracts and the change orders. [20-2]–[20-4]; [20-6]; [47] ¶ 45. While Direct Steel raises multiple defenses to the validity and enforcement of the change orders, as discussed below, none of these succeed. Nucor has established the existence of a valid contract.

Nucor supplied Direct Steel the materials by January 2022. [47] ¶ 46. There is no dispute that this delivery occurred in full, and thus Nucor completed its performance. *See, e.g., Poppingfun, Inc. v. Integracion de Marcas*, No. 13-19-00143-CV, 2021 WL 317648, at *4 (Tex. App. Jan. 28, 2021) (finding performance complete after defendant satisfied duty to physically deliver goods).

Direct Steel has breached the contracts by not paying the full price as agreed under the contracts and change orders. [47] ¶¶ 37, 39. Nucor has been damaged by not receiving the outstanding balance. [47] ¶ 48.

## B. Prior Breach Defense

Direct Steel argues that the change orders are invalid because Nucor had already breached the contracts when Nucor failed to provide the materials by the contracts' "Must Ship By Date." [46] at 14–15. But the Order Acknowledgement and Agreements explicitly stated that the "Must Ship By Date" was "a price protection date and not a delivery date." [20-2] at 3; [20-3] at 3. They also stated that no fabrication or delivery date for either project had been set. [20-2] at 7; [20-3] at 7.

Even without considering the acknowledgments, the contracts make clear that "Any 'Must Ship By Date' set forth in the Sales Documents is for purpose of price protection only." [20-2] at 22; [20-3] at 17. Direct Steel argues that this language is

11

ambiguous because the contracts also provide that the price will be honored if the contract is entered into by a specific date. [46] at 5–6. According to Direct Steel, these terms are in direct conflict with each other. *Id.*

Reading these terms together does not create a conflict or ambiguity. The price was simply contingent on two conditions: Direct Steel had to sign the contract by a certain date, and Nucor had to deliver the materials by the "Must Ship By Date" to maintain the contract's price. [20-2] at 25; [20-3] at 20 ("This Price will be honored if the Order is Entered by (Entry Date) . . . *and* the price will be protected if Delivered by (Must Ship by Date)." (emphasis added)). I will not construe these two terms to conflict to create an ambiguity. *See Thomas v. Thomas*, No. 05-22-00137-CV, 2023 WL 8862695, at *2 (Tex. App. Dec. 22, 2023) ("[Courts must] examine the entire agreement and give effect to each provision so that none is rendered meaningless.")

Direct Steel offers evidence that it discussed these terms with Nucor and was led to believe that the materials would be delivered by the "Must Ship By Date." [54] ¶ 7. But unambiguous terms are enforced as written—parol evidence cannot be used to create an ambiguity or give the term a different meaning from that its language imports. *Mission Pharmacal Co. v. Molecular Biologicals, Inc.*, 112 F.4th 337, 342 n.2 (5th Cir. 2024) (citing *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008)).

Direct Steel also argues that the contracts "limit" any increase in price "to delays beyond [Nucor's] control," and that Nucor caused the shipping delay, thus breaching the contracts. [46] at 6. Direct Steel's Vice President says that Nucor

"promised it would provide final drawings by March 19, 2021 in order to meet its May 29, 2021 'Must Ship by Date." [49] ¶ 20. Nucor "failed to do so and did not provide final drawings until March 25, 2021." [49] ¶ 21. The alleged promise to deliver the drawings is not in the contracts, and the acknowledgments set the deadline for final drawings as "to be determined." [20-2] at 3; [20-3] at 3.

Even taking Direct Steel's facts as true, this delay cannot be the basis for breach of contract. The six-day delay does not violate any contract provision, nor does Direct Steel present any evidence that Nucor's delay in providing the final drawings caused the extension of the "Must Ship By Date." Summary judgment is the "put up or shut up" moment in a lawsuit, that is, the time for the "responding party to come forward with the evidence it has." *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009). To survive summary judgment, Direct Steel must offer evidence on which a jury could reasonably find in its favor, and a "mere existence of a scintilla of evidence" in support of its position is insufficient. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). In contrast, Nucor has presented evidence that the parties set no delivery date when contracting and had no set production schedule until the change orders. Any delay in providing the final drawings is not a material breach of the contracts.

Direct Steel also argues that Nucor's only justification for the price change was the increase in Nucor's costs, which is not permitted under the contracts. [46] at 6. Not so. The contracts permit Nucor to increase the price "for any additional costs incurred by Seller" if the products do not ship by the "Must Ship By Date." [20-2] at

22; [20-3] at 17. The acknowledgments also explicitly state that "the price of this project could change" because Direct Steel's order was "an approval/EWO order." [20-2] at 3; [20-3] at 3.

Direct Steel has presented no dispute of fact on which a reasonable jury could find that Nucor breached the contract. And even if Nucor breached the contract, Direct Steel is still beholden to it. A party is excused and discharged from further performance of a contract if the other party committed a material breach. *State Farm Lloyds v. Fuentes*, 597 S.W.3d 925, 933 (Tex. App. 2020). But a nonbreaching party that chooses to treat a contract as continuing after the other party's material breach "deprives [it]self of any excuse for ceasing performance on [its] own part." *Man Indus. (India) Ltd. v. Midcontinent Exp. Pipeline, LLC*, 407 S.W.3d 342, 368 (Tex. App. 2013) (overruling defendant's prior material breach defense when it accepted "belated delivery" of goods). When Direct Steel thought Nucor breached the contracts, it continued to seek their benefit. *See* [38-2] at 11 ("Our reservation of rights is not . . . grounds for [Nucor] to withhold performance."); [38-2] at 13 ("[F]or now, we will acquiesce to signing the unilaterally imposed [warehouse] Change Order form. We expect previously discussed delivery dates to remain intact."); [20-7] at 2 (same regarding covered storage change order). It signed the change orders and did not refuse "late delivery" of the materials. [47] ¶¶ 15, 19, 22, 26; [54] ¶ 32. Even if Nucor was contractually required to deliver the materials by the "Must Ship By Date" or caused the delay in delivery, Direct Steel is not excused from its own performance.

Nucor is entitled to summary judgment on Direct Steel's prior breach defense.

14

C.     **Economic Duress Defense**

To succeed on its economic duress defense, Direct Steel must show that Nucor threatened to do something it had no legal right to do, and the threat created an imminent restraint, destroying Direct Steel's free will without means of protection. *See In re Frank Kent Motor Co.*, 361 S.W.3d 628, 632 (Tex. 2012). "Whether the conduct or acts of the party accused constitute duress is a question of law." *Leibovitz v. Sequoia Real Est. Holdings, L.P.*, 465 S.W.3d 331, 349 (Tex. App. 2015).

1.     *Legal Right to Threaten Termination and Increase Price*

Direct Steel argues that Nucor had no legal right to unilaterally increase the prices and threaten to terminate the contracts if Direct Steel did not agree to the change orders. [46] at 7–8. But Nucor was within its right to raise the prices under the contract: "If the Products do not ship by the designated "Must Ship By Date" due to delays beyond Seller's control, . . . the price provided in the Sales Documents may be increased by Seller for any additional costs incurred by Seller." *See* [20-2] at 3, 22; [20-3] at 3, 17. The materials did not ship by the "Must Ship By Date." *See* [47] ¶ 46; [54] ¶ 32. And as discussed above, Direct Steel presents no evidence that the delays were due to actions that were within Nucor's control, instead of the result of the initial contracts not setting a full production and delivery schedule.

Nucor's email stating that it would cancel the contracts if Direct Steel breached its obligations was also permitted under the contracts: "Upon Seller having reasonable grounds for insecurity with respect to Purchaser's performance, Seller may demand written assurance of performance. Until adequate assurance is received, Seller may suspend performance, including, without limitation, design, fabrication or

15

delivery of the Products." [20-2] at 22; [20-3] at 17. The contracts also granted Nucor the "right to terminate any Sale Documents" in the event Direct Steel failed to make payment. *Id.* "A threat to exercise one's rights under a contract does not constitute duress." *Villaje Del Rio, Ltd. v. Colina del Rio, LP*, No. SA-07-CA-947-XR, 2009 WL 10670091 at *7 (W.D. Tex. March 5, 2009) (quoting *First Nat. Bank of Bellaire v. David W. Showalter, P.C.*, No. 14-95-01532, 1998 WL 350518 at *4 (Tex. App. June 25, 1998)).

Direct Steel has presented no evidence on which a reasonable juror could find that Nucor had no legal right to raise the contract prices or remind Direct Steel of Nucor's rights to terminate the contracts.

> ### 2. *Imminent Restraint, Free Will & Means of Protection*

Direct Steel's economic duress defense also fails because a threat must be imminent, destroy the party's free agency, and leave the party with no present means of protection. *See Leibovitz*, 465 S.W.3d at 349.

Direct Steel argues that Nucor's threat to cancel the contracts was imminent and left it without choice or protection because of the nature of the supply chain for pre-engineered metal buildings and government contracts. [46] at 9–11. Pre-engineered metal buildings have long lead times and any delay in delivery would have delayed the entire project. [54] ¶ 22. Thus, Direct Steel argues that it could not have found a new supplier and complied with its underlying contract timeline. [46] at 10. Failure to meet the underlying contract's deadlines could result in damages, loss of reputation, and difficulties in gaining future government contracts. [54] ¶¶ 22–28.

16

Although the industry put Direct Steel in a tough spot, the change orders and Nucor's email did not create an imminent restraint. Direct Steel signed the first change order 167 days after it received it, the second 68 days after receipt, and the fourth one day after receipt. [47] ¶¶ 13, 15, 16, 19; [20-6]. Direct Steel had enough time, as it admits, to explore "the possibility of contracting with other manufacturers." [47] ¶ 32. A person who has "adequate time to consult with professionals" cannot show a restraint was imminent. *Sudan v. Sudan*, 199 S.W.3d 291, 292–93 (Tex. 2006).

The change order and threat to terminate the contract also did not remove Direct Steel's free will. While it may have been undesirable for Direct Steel to pay more or seek legal remedies at the time, "the mere fact that a person enters into a contract with reluctance, or as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, does not, of itself, constitute business compulsion or economic duress invalidating the contract." *Berry v. Encore Bank*, No. 01-14-00246-CV, 2015 WL 3485970, at *13 (Tex. App. June 2, 2015). "Stress of business conditions will not constitute duress unless the defendant was responsible for that condition." *Id.* While Direct Steel argues that Nucor intentionally put it in a position where it had to accept the change orders, [46] at 11, it does not present any evidence of this.

Direct Steel also presents no evidence that it had no means of protection. It explored contracting with other manufacturers and considered bringing a lawsuit for breach of contract. [20-5] at 2; [20-7] at 2–3. Instead of pursuing those protections,

17

Direct Steel signed the change orders and "expressly reserve[d] all rights to later pursue a claim against [Nucor]." *Id.*

Direct Steel does not raise a fact issue about whether Nucor's threat of termination and price increase deprived Direct Steel of a present means of protection or caused it imminent restraint revoking its free will. Nucor is entitled to summary judgment on this defense.

### D.  Unconscionability Defense

A contract is unconscionable when it is "so one-sided, with so gross a disparity in the values exchanged, that no rational contracting party would have entered the contract." *Houston AN USA, LLC v. Shattenkirk*, 669 S.W.3d 392, 395 (Tex. 2023). Because it renders a contract unenforceable, proving a contract is unconscionable is a high bar. *Rex Performance Prod., LLC v. Sulzer Chemtech USA, Inc.*, No. 05-22-01314-CV, 2024 WL 339358, at *4 (Tex. App. Jan. 30, 2024).

The party asserting unconscionability has the burden of proving both procedural and substantive unconscionability. *LeBlanc v. Lange*, 365 S.W.3d 70, 88 (Tex. App. 2011). In determining unconscionability, courts "examine (1) the entire atmosphere in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the non-bargaining ability of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable." *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex. App. 2005).

Direct Steel presents no evidence that would allow a reasonable juror to find the contracts or change orders unconscionable. Direct Steel argues that the contracts'

price protection clause is illusory because Nucor could unilaterally increase the cost when Direct Steel was not at fault for any delay. [46] at 13. But as discussed above, the contracts clearly lay out the two conditions for price protection and Nucor's ability to increase the contract prices. [20-2] at 3, 22; [20-3] at 3, 17. Both Direct Steel and Nucor are sophisticated parties. Direct Steel presents no evidence that it had no bargaining power when it agreed to the contracts' terms that Nucor could raise the price. While Direct Steel argues that Nucor manipulated the situation to force it to accept the change orders, [46] at 13, it presents no evidence of this.

In contrast, Nucor establishes that the contracts had no set delivery date and permitted Nucor to raise the contract prices if it incurred additional charges. [20-2] at 3, 22; [20-3] at 3, 17. "[T]he principle of unconscionability is one of preventing oppression and unfair surprise, *not* the disturbance of allocation of risks because of superior bargaining power." *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 204 (5th Cir. 1987). Direct Steel accepted the risk that Nucor would raise prices when it first signed the contracts without negotiating a firm production and delivery schedule. No reasonable juror could find that Nucor's actions or the change orders were unconscionable.

### E. Acquiescence Defense

Acquiescence is "an affirmative defense that precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lindley v. McKnight*, 349 S.W.3d 113, 131 (Tex. App. 2011). Direct Steel argues that Nucor should be estopped from enforcing the contract because Nucor allegedly

acquiesced to Direct Steel's reservation of rights when it signed the change orders. [46] at 13–14.

Direct Steel emailed Nucor that it "expressly reserve[d] all rights to later pursue a claim against [Nucor]. But, for now, [it would] acquiesce to signing the unilaterally imposed Change Order form[s]." [20-5] at 2; [20-7] at 2. Nucor responded questioning whether "Direct Steel [would] attempt to withhold full payment of the entire purchase price as adjusted by the Change Order[s]." [38-2] at 11. Direct Steel replied that it would "comply with its contractual obligations. [Its] reservation of rights [wa]s not a declaration that [it] intend[ed] to breach the contract, nor [wa]s it grounds for [Nucor] to withhold performance." *Id.*

Nothing in this exchange suggests that Nucor acquiesced to Direct Steel not paying the price changed by the contract orders. The only right Direct Steel reserved was to "later pursue a claim" against Nucor. [20-5] at 2; [20-7] at 2. Indeed, Nucor attempted to reaffirm Direct Steel would actually pay the full price under the change orders. [38-1] at 11. This is consistent with Nucor's current claim for breach of contract. Direct Steel has not presented any facts that would permit a jury to find that Nucor acquiesced to Direct Steel not being bound by the change orders. Nucor is entitled to summary judgment on this defense.

### F.    Interest and Attorney's Fees

The contracts allow Nucor to charge interest on outstanding balances. [20-2] at 22; [20-3] at 17. Direct Steel presents no argument beyond those above that this term is unenforceable. Nucor is entitled to interest on the outstanding balance as outlined in the contract.

Nucor also seeks attorney's fees under the contracts, in which "[Direct Steel] agree[d] to pay all collection costs incurred by [Nucor], including its reasonable attorneys' fees." *Id.* But further proceedings are needed to address reasonable attorney's fees. The scope of reasonable attorneys' fees may be a question of fact for the jury. Under Federal Rule of Civil Procedure 54(d)(2)(A), "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Typically, fees that are "sought under the terms of a contract" are proven at trial as an element of damages. Fed. R. Civ. P. 54(d) advisory committee notes to 1933 amendment. However, "[t]he language of the contract and the nature of the claim are the dispositive factors concerning whether the fees are an element of damages or collateral litigation costs." *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1039–40 (5th Cir. 2014); *see also Rissman v. Rissman*, 229 F.3d 586, 587–88 (7th Cir. 2000) (holding that contractual attorneys' fees may be pursued under Rule 54(d)(2) in appropriate situations.).

## III.  Judgment on the Pleadings

Nucor moves for judgment on the pleadings on Direct Steel's contract and fraud claims. [29]. As Nucor is entitled to summary judgment on Direct Steel's contract claims for unconscionability and economic duress, Nucor's motion as to those claims is moot.

Federal Rule of Civil Procedure 12(c) permits any party to move for judgment on the pleadings after the pleadings are closed. To survive a motion for judgment on the pleadings, the complaint must "state a claim to relief that is plausible on its face."

Fed. R. Civ. P. 9(b). Allegations of fraud are subject to Rule 9(b)'s heightened pleading standard. *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th Cir. 2024). The complaint must describe the "who, what, when, where, and how" of the fraud to survive a motion to dismiss. *United States ex rel. Prose v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 739 (7th Cir. 2021).

Judgment on the pleadings is proper when "it is beyond doubt that the nonmoving party cannot prove facts sufficient to support its position and that the movant is entitled to relief." *Citizens Ins. Co. of Am. v. Wynndalco Enters., LLC*, 70 F.4th 987, 994 (7th Cir. 2023). I consider only the matters presented in the pleadings and view the facts in the light most favorable to the nonmoving party. *Id.*

## A. Applicable Law

The parties dispute which state's law applies to Direct Steel's claim for fraud. [43] at 14; [45] at 13. Direct Steel argues that Illinois law should apply, following the choice-of-law rules of Illinois. [43] at 14–15. But Direct Steel's argument disregards the choice-of-law provisions in the contracts: "To the fullest extent allowed by law, this Agreement shall be governed by the laws of the State in which Seller's facility is located, without regard to any conflicts of laws provisions that would direct the application of the laws of any other jurisdiction." [20-2] at 23; [20-3] at 18. Nucor's facility was in Texas. *See* [20-2] at 9; [20-3] at 9.

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). Illinois courts typically enforce contractual choice-of-law provisions. *Dancor Const., Inc. v. FXR Const., Inc.*, 2016 Il App (2d) 150839, ¶ 73. "[C]laims that

22

are dependent upon the contract are subject to a contract's choice-of-law clause regardless of the breadth of the clause." *NewSpin*, 910 F.3d at 306. Claims are "contract-dependent" when "the action alleges a wrong based upon interpretation and construction of the contract" rather than "elements constituting an independent tort." *Id.* Direct Steel's fraud allegations are dependent on the contracts. Direct Steel alleges that Nucor engaged in a fraudulent scheme by underestimating its quotes and delivery date, with the intention to substantially increase the contract prices after it was too late for Direct Steel to find another supplier. [20] ¶¶ 23, 29–30, 47, 56–59, 99, 101, 106–08, 118. Without the contracts, Direct Steel's fraud claim would not exist. Texas law applies to the fraud claim.

### B.    Adequacy of Allegations

To state a claim for fraudulent inducement, Direct Steel must allege Nucor: (1) made a material representation; (2) knowing that it was false or without knowledge of its truth; and (3) made it with the intention that the misrepresentation should be acted on by Direct Steel; (4) which Direct Steel justifiably relied on; and (5) which caused injury. *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 557 (Tex. 2019).

Direct Steel alleges that Nucor induced it to sign the contracts by knowingly providing a false price and setting an unachievable delivery date, with the intent to delay delivery beyond that date to put Direct Steel in an untenable position, forcing it to agree to significant price hikes. [20] ¶¶ 23, 29, 30, 47, 56–59, 99, 101, 106–08, 118. Nucor denies all of these allegations. [21] ¶¶ 23, 29, 30, 47, 56–59, 99, 101, 106–08, 118.

23

Nucor argues that Direct Steel has not alleged that Nucor made any false representations because the contracts did not contain a delivery date and provided that the price was subject to change. [30] at 15–16; [45] at 14–15. Thus, according to Nucor, the delivery date and original price were not false representations, nor could Direct Steel have justifiably relied on them.

The contracts are unambiguous that the "Must Ship By Date" is not a delivery date and that there was no delivery date set at the time of contracting. [20-2] at 3, 7, 20; [20-3] at 3, 7, 17. The contracts are also unambiguous that the price was not firm—it could increase if the projects were delayed beyond the price-protection date. *Id.* Thus, the parties' written agreement directly contradicts Direct Steel's alleged belief that Nucor promised to deliver the materials by the price-protection date and at the price originally agreed to. The price flexibility in the contracts refers to delays beyond Nucor's control, and Direct Steel alleges that when signing the contracts, Nucor intended to delay delivery and increase the materials cost, which suggests that the price changes were inconsistent with the contract. [20] ¶¶ 23, 29–30, 99, 107. But that does not suggest an upfront fraudulent misrepresentation. "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). But as discussed above, the contracts effectively disavow any promises that the delivery dates and contract prices cannot change.

Even accepting Direct Steel's allegations that Nucor made false representations outside of the contract about the delivery date and prices as true, "[t]o prevail on a fraud claim, a plaintiff must show actual and justifiable reliance." *Mercedes-Benz*, 583 S.W.3d at 558. Whether a party's actual reliance is justifiable is ordinarily a fact question, "but the element may be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Id.* When a "claim of fraudulent inducement is directly contradicted by the contract's terms . . . there could be no justifiable reliance . . . as a matter of law." *Id.* at 559. Direct Steel could not have justifiably relied on the alleged promises that Nucor would deliver the materials by the "Must Ship by Date" when the contract held no such promise. Nor could Direct Steel have justifiably relied on the alleged promised contract prices to remain the same, because the contract expressly represented that prices could change. Further, Direct Steel provides no facts supporting its conclusory allegation that Nucor intended to delay delivery and increase prices as required by Rule 9(b). While Direct Steel alleges that Nucor did indeed delay delivery and increase the contract price, "failure to perform a contract is not evidence of fraud." *See Formosa*, 960 S.W.2d at 46, 48 ("As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort.").

Direct Steel has not alleged that Nucor made false material representations on which Direct Steel justifiably relied. Nucor's motion for judgment on the pleadings, [29], is granted.

## IV.    Motion to Dismiss

When reviewing a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a court accepts all well-pled allegations as true and draws all reasonable inferences in favor of the plaintiff. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 881 (7th Cir. 2022). "To survive a motion to dismiss, a plaintiff must plead 'only enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 9(b)'s heightened pleading standard applies to False Claims Act claims. *Prose*, 17 F.4th at 739.

To state a claim under the False Claims Act, Direct Steel must allege that Nucor made a false statement to receive money from the government knowing it was false that caused injury to the government. *See id.* at 739–40. Fraud in the inducement for a government contract is an actionable harm under the FCA. *Id.* at 740. The FCA covers false claims "made to a contractor" if the federal government has provided or will reimburse the funds and "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest." 31 U.S.C. § 3729(b)(2)(A)(ii).

Direct Steel presents two theories for its FCA claim: (1) Nucor knowingly submitted an artificially low bid and a price-protection date that it knew it could not meet, with the intent to delay delivery past the price-protection date and raise the contract prices; and (2) Nucor knowingly and intentionally presented fraudulent change orders for payment. [24] at 5; 22-cv-3860, [1] ¶¶ 37, 43–44, 66, 69.

To successfully state a claim for fraudulent inducement, Direct Steel needs to alert Nucor "with the necessary specificity of how it allegedly misrepresented" its

26

quoted price and price-protection date "in order to induce the government to enter into a contract." *Prose*, 17 F.4th at 741. Direct Steel must provide a plausible basis for believing that Nucor entered into a government contract with the intent not to perform or with the knowledge that it could not perform as promised. *Id.* at 741–42 (citing *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("[F]ailure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud.")); *see also United States ex rel. Lusby v. Rolls–Royce Corp.,* 570 F.3d 849, 853–54 (7th Cir. 2009) ("Simple breach of contract is not fraud, but making a promise while planning not to keep it is fraud."). Rule 9(b) permits such intent to be alleged generally. *Prose*, 17 F.4th at 742.

Direct Steel alleges that Nucor "knew of Direct Steel's . . . contract with the United States Government." 22-cv-3860, [1] ¶ 4. Nucor then engaged in a "bait-and-switch scheme" and "fraudulent procurement process" by "quot[ing] the Contracts with the intention of obtaining the contract and then later substantially increasing the prices after it was too late for Direct Steel to find another supplier." *Id.* ¶¶ 8, 11, 44. Nucor submitted "a false and fraudulent quote with which it had no intention of complying." *Id.* ¶ 65. Nucor "entered the Contracts knowing it would not honor the quoted price." *Id.* ¶ 43. Nucor then "intentionally and purposefully failed to deliver the [materials] by May 29, 2021 in order to charge Direct Steel more than the honored, price protected contract amounts." *Id.* ¶ 37. Nucor knew Direct Steel would not be able to meet its own deadlines and would face consequences if it found another supplier delaying delivery. *Id.* ¶¶ 11, 57–62.

While "[m]aking a false promise in order to obtain something of value is fraud, and can be the basis of a claim under the False Claims Act," Direct Steel fails to meet Rule 9(b)'s heightened standard for pleading for promissory fraud. *See U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1105 (7th Cir. 2014) (citations omitted). An allegation that Nucor did not intend to comply with the contracts when signing them is not enough to suggest a plausible claim for relief. *See id.* at 1105–06 (upholding dismissal of complaint with no specific facts supporting allegation that defendant knew it did not intend to honor the contract at the time of contracting). The complaint is devoid of any specific facts to reasonable infer that at the time of contracting Nucor knowingly could not, or intentionally would not, meet the price-protection date and intended to raise the prices. The alleged bait-and-switch scheme lacks a basis to infer that Nucor did not intend to honor its contractual promises (which as discussed above did not promise delivery and did not set a price certain).

As to the falsity of the change orders, Direct Steel only alleges that Nucor "defrauded Direct Steel and by extension the United States government by increasing the fraudulent change orders by $431,126," and that Nucor "presented false or fraudulent claims for payment . . . by submitting false estimated costs for [materials] in . . . change orders." 22-cv-3860, [1] ¶¶ 66, 69. While Rule 9(b) does not require a plaintiff prove its case in the complaint, it does require specificity. *Prose*, 17 F.4th at 741. Direct Steel's allegations do not meet this bar.

Because Direct Steel has not adequately alleged any false statements, I do not reach the parties' arguments regarding economic loss and the materiality of the alleged fraud to the government's funding decisions.

Defendant's motion to dismiss, 22-cv-3860, [19], is granted with prejudice as to Direct Steel's promissory fraud theory, but without prejudice as to the fraudulent change order theory.[4]

## V.    Conclusion

Defendant's motion for summary judgment, [36], is granted. Defendant's motion for judgment on the pleadings, [29], is moot as to the economic duress and unconscionability defenses and granted as to plaintiff's fraud claim. Defendant's motion to dismiss, 22-cv-3860, [19], plaintiff's False Claims Act claim is granted.

The only remaining issue in this case is that of damages and attorney's fees for Direct Steel's breach of contract.


ENTER:

_____
Manish S. Shah
United States District Judge

Date: November 25, 2024

---

[4] Ordinarily, a plaintiff should be given at least one opportunity to amend a complaint. *Ryder v. Hyles*, 27 F.4th 1253, 1258 (7th Cir. 2022) (quoting *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015)). However, amendment to Direct Steel's promissory fraud theory would be futile—as discussed above the contracts make no false promises of a delivery date nor fixed prices. Direct Steel was a sophisticated party that assumed the risk that the delivery date would be delayed after the "Must Ship by Date" and that the contract prices may increase.

29